UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORVILLE KENLOCK,

                              Plaintiff,

        -against-

ORANGE COUNTY, NEW YORK, *a municipal
entity*, SHERIFF CARL E. DUBOIS, *in his
individual and official capacities*, COLONEL
ANTHONY M. MELE, *in his individual and official
capacities*, C.O. BLOISE, *Shield #360, in his
individual and official capacities*, SERGEANT K.
KISZKA, *Shield #134, in his individual and official
capacities*, LIEUTENANT J. POTTER, *in his
individual and official capacities*, and ORANGE
COUNTY CORRECTIONAL LINE AND
COMMAND JOHN DOE OFFICERS, *in their
individual and official capacities*,

                              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __09/30/2022__

No. 20 Civ. 3693 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

        Plaintiff Orville Kenlock, formerly detained at the Orange County Correctional Facility

("OCCF") first as a pretrial detainee and later as a parole violation detainee, brings this 42 U.S.C.

§ 1983 action, alleging violations of his rights under the First, Fourth, and Fourteenth

Amendments.

        His allegations stem from an incident in June 2018, when Defendant Correctional Officer

Bloise ordered Plaintiff, who was applying prescription ointment to his genitals inside his cell, to

remove toilet paper covering the lower part of his cell window so that he could see into the cell

while conducting a formal head count. Plaintiff alleges that Bloise violated his constitutional

rights, and that after he filed multiple grievances against him, the other individual defendants failed

to meaningfully investigate his grievances and supervise Bloise. He also alleges that these

violations were caused by Defendant the County of Orange's failure to properly train staff on how

to investigate detainee grievances. Plaintiff sues Defendants Bloise and the County of Orange, as well as Defendants Sheriff Carl E. Dubois, Colonel Anthony M. Mele, Sergeant K. Kiszka, Lieutenant J. Potter, and other County Correctional Line and Command John Doe Officers (the "supervisory defendants"), all individual defendants sued in their individual and official capacities.

Presently pending before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 48.) For the following reasons, the Court GRANTS Defendants' motion.

## BACKGROUND

### I.  Factual Background

The following facts are derived from the Second Amended Complaint ("SAC," ECF No. 43) and are taken as true and constructed in the light most favorable to Plaintiff at this stage.[1]

#### A.    Plaintiff is Arrested in May 2018 and Remanded to OCCF

On May 9, 2018, Plaintiff, a black man, was arrested at the Middletown Municipal Court for grand larceny and burglary. (SAC ¶¶ 17–18.) Plaintiff was remanded as a pretrial detainee to OCCF and remained there until September 7, 2018, when he was transferred to the Downstate

---

[1] The Court notes that some of Plaintiff's allegations describe events that are not necessarily in chronological order and that fail to include certain salient facts, which make it difficult to comprehend how certain allegations occurred in relation to each other. Further, many of Plaintiff's allegations seem to assert factual conclusions which cannot be reasonably inferred from the rest of his allegations.

To be sure, for purposes of this motion, the Court recognizes that it must accept all factual allegations in the SAC as true and draw all reasonable inferences in Plaintiff's favor. *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137 (2d Cir. 2013). However, "the [C]ourt cannot simply 'fill in the blanks' to supply what is missing, on a motion to dismiss," *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 357 (W.D.N.Y. 2018), "or follow a bread crumb trail of a represented plaintiff." *Jackson v. Cnty. of Onondaga*, No. 917CV845GLSCFH, 2019 WL 355729, at *4 (N.D.N.Y. Jan. 28, 2019). Put differently, at this stage, the Court is not required to either speculate or puzzle out Plaintiff's allegations in such a way that the Court would be effectively pleading his claims for him. With that in mind, the following compilation of facts is the result of the Court's attempt to figure out the logical temporal order that Plaintiff may have originally intended

Correctional Facility in Fishkill, New York after pleading guilty to the charges against him. (*Id.* ¶¶ 22–23.)

At the time of his detention at OCCF, Plaintiff suffered from a rash in his genital area of which he had already been suffering for a period of time. (*Id.* ¶ 28.) To treat this rash, OCCF's medical staff prescribed Plaintiff an ointment he had to apply on the affected areas on a daily basis. (*Id.*) On daily basis, before Plaintiff applied the ointment while using his cell's toilet, he placed toilet paper to block the lower portion of his cell's plexi-glass window (the "toilet paper practice"). According to Plaintiff, this toilet paper practice was accepted by OCCF staff and common in various residential blocks at OCCF when detainees used their cells' toilets. (*Id.* ¶¶ 31–33.)

B.     *The June 9, 2018 Incident with Bloise*

On June 9, 2018, between 6:30 a.m. to 7:00 a.m., Plaintiff followed the toilet paper practice as he had been doing so for about a month without incident, and applied the prescription ointment to his genital area inside his cell. (*Id.* ¶ 40.) At that time, Bloise, a white correctional officer, was conducting a "head count" of the individuals assigned to Plaintiff's residential block area. Upon seeing the toilet paper on the cell's plexi-glass, Bloise ordered Plaintiff to take it down. (*Id.* ¶ 41.) Plaintiff informed Bloise that he was naked and that his penis was exposed because he was applying the prescription ointment on his genital area due to his rash. (*Id.* ¶ 42.) Bloise responded "it does not matter; I want to see it; and I need to see it." (*Id.* ¶ 44.) Plaintiff complied with Bloise's order, and when he was exposed, he told Bloise: "see, I told you I was naked." (*Id.* ¶ 46.)

C.     *Plaintiff Submits Requests to Speak with His Counselor and Files a Grievance Against Bloise for the June 9, 2018 Incident*

That same day, Plaintiff submitted a "Service Request Form" requesting to speak with his counselor "Ms. Pam" to talk about the incident with Bloise.  (*Id.* ¶ 50.) The next day, Plaintiff

submitted another Service Request Form requesting counseling and expressing that he was depressed. (*Id.* ¶ 51.)

On June 11, 2018, Plaintiff submitted an additional Service Request Form requesting counseling. (*Id.* ¶ 52.) He also submitted a notarized executed letter to Defendant Potter, who was the head of OCCF's Prison Rape Elimination Act unit ("PREA unit"), detailing the incident with Bloise and accusing him of sexual harassment. (*Id.* ¶ 53.) Plaintiff further filed a grievance against Bloise and requesting disciplinary measures and prosecution against him. (*Id.* ¶ 55.) A fellow detainee from Plaintiff's residential block at OCCF submitted a statement corroborating the incident with Bloise. (*Id.* ¶ 56.) Plaintiff never received a response from Potter about his June 11, 2018 PREA submission. (*Id.* ¶ 58.)

Sometime after June 11, 2018, Plaintiff met with his counselor, Ms. Pam, together with Sergeant Widmark and Defendant Kiszka, OCCF's designated grievance coordinator. At the meeting, Sergeant Widmark informed Plaintiff that whatever the outcome of his June 11, 2018 grievance, OCCF would direct Bloise to "stay away" from Plaintiff and that he should have no further contact with him. (*Id.* ¶ 72.)

On June 17, 2018, Plaintiff submitted an additional Service Request Form asking again to meet with Ms. Pam and expressing that he was experiencing anxiety and was unable to sleep. (*Id.* ¶ 52.) Two days later, Plaintiff was assigned to a different cell in another residential block. (*Id.* ¶ 74.) Plaintiff also received a response that day from Kiszka, denying his June 11, 2018 grievance against Bloise. (*Id.* ¶ 61.) In denying the grievance, Kiszka noted that Plaintiff "did in fact" have his cell window "covered" before Bloise asked him to uncover the window, and that there was no evidence to support Plaintiff's claims of sexual misconduct by Bloise. (*Id.* ¶¶ 61, 63.) That same

day, Plaintiff appealed the denial to Defendant Mele, OCCF's Chief Administrative Officer. (*Id.* ¶ 67.)

      D.    *Bloise's Visits to Plaintiff's Newly Assigned Cell on June 23, 2018*

On June 23, 2018, despite the purported "stay away" direction, Bloise went to Plaintiff's newly assigned cell, searched Plaintiff and his cell, and told him: "I remember you." (*Id.* ¶ 75.) Immediately after, with Bloise still present, Plaintiff informed Sergeant Cimorelli, the on-duty housing block officer, about the "stay away" direction. Bloise then called Plaintiff a "piece of shit." (*Id.* ¶ 76.) Cimorelli told Bloise not to come back to the cell block anymore that day. (*Id.* ¶ 77.) Notwithstanding, Bloise came back to the cell block on two more occasions that day. (*Id.* ¶ 78.) Later that day, Plaintiff submitted an additional Services Request Form requesting to meet with Ms. Pam and stating that he was having a nervous breakdown based on his earlier interactions with Bloise. (*Id.* ¶ 81.) At an unspecified date later, Plaintiff met with Ms. Pam and discussed his depression and anxiety associated with his interactions with Bloise. (*Id.* ¶ 82.)

      E.    *Plaintiff Files a Second Grievance Against Bloise; Plaintiff's Second Grievance is Denied and the Appeals of Both His Grievances are Unsuccessful*

On June 24, 2018, Plaintiff filed a second grievance with Kiszka against Bloise for the June 23, 2018 visits. (*Id.* ¶ 83.)

On June 26, 2018, Mele denied Plaintiff's appeal of Kiszka's denial of his first grievance. (*Id.* ¶ 68.) The next day, Plaintiff appealed Mele's denial to the Citizen's Policy and Complaint Review Council. (*Id.* ¶ 71.) The following day, a fellow detainee submitted a notarized written statement corroborating the June 23, 2018 visits. (*Id.* ¶ 84.) Plaintiff also submitted a seventh Services Request Form asking to speak with Ms. Pam about his fear of Boise. (*Id.* ¶ 85.)

On June 28, 2018, Plaintiff submitted an eighth Services Request Form requesting to meet with Ms. Pam because he was having problems sleeping. (*Id.* ¶ 86.) The day after, Plaintiff received

notice that Kiszka denied his second grievance against Bloise, concluding that no misconduct had occurred and "that there was no 'stay away' order in place." (*Id.* ¶ 86.) Plaintiff appealed the denial of his second grievance to Mele, who denied such appeal that same day. (*Id.* ¶ 92.)

F.     *Ms. Pam Tells Plaintiff His Subsequent Service Request Forms Will Be Denied*

On July 9 and 11, 2018, Plaintiff submitted his ninth and tenth Service Request Forms, respectively, requesting to speak with Ms. Pam about his mental state. (*Id.* ¶ 93.) On July 15, 2018, during a meeting with Ms. Pam, she told Plaintiff that her supervisor informed her that Plaintiff should stop submitting Services Request Forms because he was "wasting" the Services Request Forms by raising matters that "were not that important." (*Id.* ¶ 94.) Ms. Pam apologized to Plaintiff for raising such issue with him. (*Id.* ¶ 97.)

G.     *Bloise Unsuccessfully Attempts to Pat Frisk Plaintiff on July 17, 2018*

On July 17, 2018, Bloise stopped Plaintiff to pat him down while he was on his way to a substance abuse program at the OCCF. (*Id.* ¶ 101.) Plaintiff asked Bloise not to subject him to the search, but Bloise said "no" and told Plaintiff: "if I don't frisk you, no one else can and you won't go to the program." (*Id.* ¶ 101.) A female correctional officer, Rodriguez, witnessed the exchange and told Bloise to not "do that," and she called for a different male officer to come and administer the pat frisk on Plaintiff. (*Id.* ¶ 102.) Plaintiff subsequently submitted an eleventh Services Request Form for counseling despite having been told that OCCF would not provide him with it. (*Id.* ¶ 105.)

H.     *The Razor Incident on July 27, 2018; Plaintiff's Appeal of His First Grievance is Denied Again*

On July 27, 2018, Plaintiff planned to shave at around 7:00 a.m. (*Id.* ¶ 106.) Bloise arrived at Plaintiff's cell and told him "you don't need to give me your ID for the razor, sexy chocolate," as he placed a razor in Plaintiff's door and refused to take Plaintiff's ID in exchange for the razor.

(*Id.*) Plaintiff rejected the razor and told Bloise to stop harassing him. (*Id.* ¶ 107.) Bloise retrieved the rejected razor and told him "you get over it and shut your mouth." (*Id.*) Plaintiff subsequently reported the incident to Sergeant Delaphia, Lopes, and Potter. (*Id.* ¶ 109.) Plaintiff also submitted his twelfth Services Request Form for counseling to talk about the razor incident with Ms. Pam. (*Id.* ¶ 111.) The next day, during a meeting with Ms. Pam, she told Plaintiff that she reported the razor incident to Sergeant Zeppelin. (*Id.*)

On July 30, 2018, Plaintiff submitted his thirteenth Services Request Form to speak with Ms. Pam's mental health supervisor about the razor incident. (*Id.* ¶ 112.) Plaintiff never received a response for his July 30, 2018 Service Request Form. (*Id.* ¶ 113.)

On August 8, 2018, Plaintiff submitted a letter to Ms. Pam's supervisor, "Ms. Nicole," in which he told her he had learned that OCCF deemed his requests unimportant and to assign him another mental health services counselor. (*Id.* ¶ 115.) Plaintiff subsequently met with Ms. Nicole, who confirmed that the OCCF had told her to ask Plaintiff to stop transmitting requests for mental health services. (*Id.* ¶ 116.)

On August 9, 2018, the Citizen's Policy and Complaint Review Council, to which Plaintiff had appealed Mele's denial of his first grievance, denied his appeal. (*Id.* ¶ 117.)

  I.  *Plaintiff is Transferred Out of OCCF in September 2018, then Released in January 2019, and Rearrested in July 2019 for Violating Parole*

In September 2018, Plaintiff is transferred out of OCCF to an upstate correctional facility, from which he was later released on parole in January 2019. (*Id.* ¶ 124.) Plaintiff was later rearrested in July 2019 for violating the terms and conditions of his parole, and remanded to OCCF, where he remained until September 2019 until he was transferred to another upstate correctional facility. (*Id.* ¶ 125.)

      *J.*      *The September 7, 2019 "Lockdown" Incident*

On September 7, 2019, Bloise effectively placed Plaintiff on a "lockdown" and prevented Plaintiff from attending recreational exercise outside his cell, taking a shower, and using his television and/or telephone privileges in a more public area. (*Id.* ¶ 132.) The "lockdown" ended until another correctional officer, Batista, permitted Plaintiff to leave cell after Bloise had left the residential block. (*Id.* ¶ 134.) Plaintiff subsequently submitted a third grievance to Kiszka against Bloise for the "lockdown" incident. (*Id.* ¶ 136.) At some unspecified date later, Plaintiff and OCCF staff agreed to resolve his third grievance against Bloise by keeping Bloise away until Plaintiff was transferred out of OCCF. (*Id.* ¶ 137.)

## II. Procedural Background

On May 12, 2020, Plaintiff commenced the instant action after filing a complaint. (Compl., ECF No. 1.) On July 17, 2020, Defendants sought leave to file a motion to dismiss, which the Court subsequently granted and issued a briefing schedule. (ECF Nos. 17 & 27.) Before the parties filed their briefing, Plaintiff sought leave to amend his Complaint and for an extension of the briefing deadlines, which the Court granted. (ECF Nos. 28 & 29.)

On October 30, 2020, Plaintiff filed his First Amended Complaint. (ECF No. 30.) After the parties filed their briefing on Defendants' motion to dismiss the entirety of Plaintiff's First Amended Complaint, on September 20, 2021, the Court granted Defendants' motion and granted Plaintiff leave to file a second amended complaint by October 25, 2021. (ECF No. 42.)

On October 25, 2021, Plaintiff filed his SAC. (SAC, ECF No. 43.) On November 5, 2021, Defendants sought leave to file a motion to dismiss the entirety of Plaintiff's SAC, which the Court subsequently granted and issued a briefing schedule. (ECF Nos. 44 & 45.) On January 31, 2022, the parties filed their respective briefing on the instant motion to dismiss: Defendants filed their notice of motion (ECF No. 48), declaration with accompanying exhibits (Lagitch Decl., ECF No.

49), memorandum in support ("Motion," ECF No. 50), and reply ("Reply," ECF No. 53); and Plaintiff filed his response in opposition ("Response in Opposition," ECF No. 54), and declaration incorporating a previously submitted declaration and its accompanying exhibits by reference (ECF No. 55 (incorporating by reference "Meyerson Decl.," ECF No. 39)).

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

### II.   42 U.S.C. § 1983 Claims

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it

describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

## DISCUSSION

By his SAC, Plaintiff asserts a total of 9 causes of action under § 1983 for:

(1) violations of his right to bodily privacy under the Fourth Amendment, against Bloise (FAC ¶¶ 149–52);

(2) racial discrimination under the Equal Protection Clause of the Fourteenth Amendment, against Bloise (*id.* ¶¶ 153–56);

(3) sexual harassment under the Equal Protection Clause of the Fourteenth Amendment, against Bloise (*id.* ¶¶ 157–60);

(4) sexual harassment under the Substantive Due Process of the Fourteenth Amendment, against Bloise (*id.* ¶¶ 161–64);

(5) retaliation under Substantive Due Process of the Fourteenth Amendment, against Bloise (*id.* ¶¶ 165–68);

(6) denial of mental health care services under Substantive Due Process of the Fourteenth Amendment, against Mele, Kiszka, Potter, Dubois, and the unidentified John Doe officers (*id.* ¶¶ 169–75);

(7) retaliation under Substantive Due Process of the Fourteenth Amendment, against Mele, Kiszka, Potter, Dubois, and the unidentified John Doe officers (*id.* ¶¶ 176–82);

(8) supervisory liability against Mele, Kiszka, Potter, Dubois, and the uidentified John Doe officers, (*id.* ¶¶ 183–87); and

(9) *Monell* municipality liability against the County (*id.* ¶¶ 188–97).

For relief, Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief. (*Id.* at 41.)

As a threshold matter, the Court dismisses all of the claims against the individual defendants in their official capacities because a municipality may not be liable under § 1983 "by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." (quotation marks and citation omitted)).

Further, while the Court recognizes that the unidentified defendants are yet to be served and to make an appearance, a review of the SAC reveals that Plaintiff employed "group pleading" and asserted substantially the same allegations against the unidentified defendants that he did against their identified supervisory co-defendants. Hence, given that (a) Defendants' arguments in the instant motions against the identified defendants are equally applicable to Plaintiff's allegations against the unidentified ones, and (b) Plaintiff has been given notice and an opportunity to be heard on such arguments, the Court will *sua sponte* determine below whether dismissal of the remaining claims against the unidentified defendants in their individual capacities is warranted. *See Citadel Mgt., Inc. v. Telesis Tr., Inc.*, 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000) (citing *Wachtler v. Cnty. of Herkimer,* 35 F.3d 77, 82 (2d Cir. 1994)).

Moreover, while Plaintiff purportedly asserts Substantive Due Process claims for sexual harassment, retaliation, and deliberate indifference, those claims are more properly analyzed under the rubric of other constitutional amendments. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion

of substantive due process, must be the guide for analyzing these claims." (cleaned up)). Accordingly, the Court will analyze Plaintiff's retaliation claims (Counts 5 and 7) under the First Amendment, and his sexual harassment and denial of mental health services claims (Counts 4 and 6, respectively) under the deliberate indifference rubric of the Fourteenth Amendment. Thus, insofar as Plaintiff independently asserts these Substantive Due Process claims, the Court dismisses them as duplicative. *See Rother v. NYS Dep't of Corrections and Community Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013).

And finally, after reviewing Plaintiff's opposition papers to Defendants' motion, the Court notes that Plaintiff failed to address Defendants' argument about Plaintiff's claims for declaratory and injunctive relief being moot as he is no longer detained at the OCCF. (*See* Mot. at 38–39; *see also* Reply at 14 (noting that Plaintiff failed to address such issue).) As such, the Court deems Plaintiff's claims for declaratory and injunctive relief abandoned and dismisses them accordingly. *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 392 (S.D.N.Y. 2013).

With all that in mind, by their motion, Defendants seek to dismiss each of Plaintiff's remaining claims for failure to state a claim. The Court addresses Defendants' arguments in the order presented in their motion.

## I.      **Plaintiff's Right to Bodily Privacy Under the Fourth Amendment**

Defendants first argue that Plaintiff fails to sufficiently allege a claim for bodily privacy violation under the Fourth Amendment because the intrusion on Plaintiff's privacy, in view of his status as a pretrial detainee, was minimal and justified. (Mot. at 14–16.) The Court agrees.

"[B]oth convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility[.]" *Bell v. Wolfish*, 441 U.S. 520, 558 (1979). The Fourth Amendment prohibits only unreasonable searches[.]" *Id.* "The test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the

invasion of personal rights that the search entails." *Id.* at 559. It follows then, that as in searches of prison inmates, the Fourth Amendment also requires searches of pretrial detainees to be "reasonably related to legitimate security interests." *Florence v. Bd. of Chosen Freeholders of Burlington*, 566 U.S. 318, 328 (2012) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

To state a Fourth Amendment claim for the infringement of the right to bodily privacy, a plaintiff must show he had (1) an actual, subjective expectation of bodily privacy; and (2) that officials lacked a sufficient justification to intrude on the plaintiff's expectation of bodily privacy. *See Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). In considering the second question, particularly in the context of pretrial detainees, the Court must analyze such claims by considering: (1) the scope of the particular intrusion; (2) the manner in which it is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *See Bell*, 441 U.S. at 559; *see also Harris*, 818 F.3d at 58 n.2 (noting that *Bell* framework applies when analyzing pretrial detainee strip-search policies).

Here, even when drawing all reasonable inferences in his favor, Plaintiff fails to plausibly allege an infringement of the right to bodily privacy. To be sure, despite his status as a pretrial detainee, Plaintiff still retains "a limited right to bodily privacy" within the confines of his cell at the OCCF. *See Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992). Moreover, given that Plaintiff was applying a prescription ointment in his genital area, it stands to reason that he arguably exhibited a limited expectation of bodily privacy. But even then, Plaintiff's allegations themselves indicate not only that Bloise had a sufficient justification to intrude on Plaintiff's expectation of bodily privacy—that is, to conduct a head count from outside the cell's plexi-glass, but also that such intrusion was minimal.

To begin, by his allegations, Plaintiff himself concedes that correctional officers, like Bloise, regularly conducted "*safety-required* head counts" to perform their "security and oversight functions" at OCCF. (SAC ¶ 39.) In other words, even when taking all reasonable inferences in his favor, Plaintiff himself concedes that when conducting a head count, correctional officers like Bloise were required to check that the detainees, like Plaintiff, were inside their cells and also to physically look inside the cells to ensure the detainees' safety. Hence, Plaintiff's own allegations indicate that Bloise did not lack justification to ask Plaintiff to take off the toilet paper from the lower portion of the plexi-glass that obstructed his view from *outside* the cell. It is not as if Plaintiff alleged, for example, that Bloise solely went to check Plaintiff's cell and not others, at around the usual time on which Bloise knew Plaintiff would apply the prescription ointment on his genital area.

Additionally, Plaintiff's allegations that Bloise observed the lower half of his body and exposed genital area is insufficient to establish that the manner of the intrusion was somehow egregious. Indeed, even when construing the SAC's allegations in his favor, Plaintiff at best alleges that Bloise's viewing of Plaintiff's exposed genital area consisted merely of a glimpse or brief viewing. *See, e.g.*, *Gambino v. Payne*, 12-CV-0824SC, 2013 WL 1337319, at *5 (W.D.N.Y. Mar. 29, 2013) (no Fourth Amendment violation where removal of sheets from shower area exposed plaintiff's genital area to officers and other inmates); *Baker v. Welch*, 2003 WL 22901051, at *20 (S.D.N.Y., Dec.10, 2003) (male parolee complained that a female parole officer watched him provide a urine sample; "the balance should be struck to allow incidental . . . viewing but prohibit regular . . . viewing."); *Miles v. Bell*, 621 F. Supp. 51, 67 (D. Conn. 1985) ("Those cases which have found a violation of inmates' rights to privacy have looked to the frequency or regularity of such 'viewing.' As a general rule, courts have found a violation only in those cases in which guards

14

regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities or showering. . . .").

Accordingly, the Court dismisses Plaintiff's claims against Bloise for violations of his right to bodily privacy under the Fourth Amendment.

## II.   Plaintiff's Equal Protection Claims for Racial Discrimination and Sexual Harassment

Defendants next argue that Plaintiff fails to state any claim under the Equal Protection Clause of the Fourteenth Amendment because he fails to allege that he was treated differently than others similarly situated or that he was treated differently based on any impermissible considerations. (Mot. at 16–18.) The Court agrees.

"The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) (internal quotation marks and citations omitted). More specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitution rights, or malicious or bad faith intent to injury a person." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (cleaned up). Thus, "to state a violation of the Equal Protection Clause, a plaintiff must allege 'that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.'" *Gilliam v. Baez*, 15-CV-6631 (KMK), 2017 WL 476733, at *7 (S.D.N.Y. Feb. 2, 2017) (quoting *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005)).

Here, nowhere in his SAC does Plaintiff allege that Bloise treated him differently than others similarly situated. *See Leneau v. Ponte*, 1:16-CV-776-GHW, 2018 WL 566456, at *5 (S.D.N.Y. Jan. 25, 2018) (dismissing claims against correctional officer because "Plaintiff fail[ed]

to plead any facts that would plausibly suggest that [the correctional officer] treated Plaintiff adversely because of his race."). In fact, Plaintiff does not even allege that he was treated differently based on an impermissible consideration. If anything, Plaintiff's allegations themselves establish that Bloise did not treat him any differently. (*See, e.g.*, SAC ¶ 120 (alleging that "Bloise ordered other male detainees to pull down toilet paper (tissues) when using the toilet in their cells notwithstanding the [OCCF's toilet paper practice].").) And insofar as Plaintiff alleges that Bloise calling him "sexy chocolate" in one occasion was adverse treatment based on his race, such allegation without more is insufficient. *See Leneau*, 2018 WL 566456, at *5 ("Mere verbal abuse or the use of racial slurs or epithets reflecting racial prejudice, although reprehensible, does not form the basis of a claim pursuant to [Section] 1983." (citations omitted)).

Accordingly, the Court dismisses Plaintiff's claims against Bloise for racial discrimination and sexual harassment in violation **of** the Equal Protection Clause of the Fourteenth Amendment.

## III.   Plaintiff's Deliberate Indifference Claims for Sexual Harassment

Defendants next argue that Plaintiff's sexual harassment claims under the deliberate indifference rubric of the Fourteenth Amendment fails because his allegations do not plausibly satisfy the objective standard of such claim. (Mot. at 18–21.) The Court agrees.

The Second Circuit has previously held that "sexual abuse of a prisoner by a corrections officer may in some circumstances violate the prisoner's right to be free from cruel and unusual punishment." *Boddie v. Schnieder,* 105 F.3d 857, 860–61 (2d Cir. 1997). Because Plaintiff was a pretrial detainee at the time of the search, the Court must analyze his claim under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983) ("[T]he State does not acquire the power to punish with which the Eighth

16

Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."). Ordinarily, however, the standard applied under either clause is nearly identical for these types of claims. *See Caiozzo v. Koreman,* 581 F.3d 63, 69, 72 (2d Cir. 2009).

To state a traditional Eighth Amendment claim, a plaintiff must allege that (1) the alleged deprivation is "sufficiently serious" under an objective standard; and that (2) the charged officials acted, subjectively, with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). However, the Supreme Court has held that, for claims involving pretrial detainees in particular, "the appropriate standard . . . is solely an objective one." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). As such, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable," *id.* and "need not demonstrate that [the] officer was subjectively aware that his use of force was unreasonable," *Ross v. Correction Officers John & Jane Does 1–5,* 610 F. App'x 75, 76 n. 1 (2d Cir. 2015).

Here, Plaintiff's allegations fail to plausibly establish that Bloise's relevant conduct (namely, the alleged June 9, 2018 incident and the "sexy chocolate" comment) was so objectively unreasonable such that it states an actionable claim of sexual harassment. Most notably, even when construing the SAC in Plaintiff's favor, nowhere does Plaintiff allege any physical contact with Bloise. "To date, in this Circuit, there has been 'no case in which a plaintiff ha[s] established an actionable claim of sexual harassment under *Boddie* without having physical contact with the alleged preparator[.]'" *Holland v. City of New York*, 197 F. Supp. 3d 529, 547 (S.D.N.Y. 2016) (collecting cases) (quoting *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 508 (S.D.N.Y. 2012)); *cf. Boddie*, 105 F.3d at 859–61 (affirming as inadequate prisoner's allegations that female correction officer made a possible "pass" at him, "squeezed his hand, touched his penis," called him a "sexy black devil," pressed her breasts against his chest more than once, and pushed her "vagina against

17

[his] penis"); *Morales v. Mackalm*, 278 F.3d 126, 132 (2d Cir. 2002) (affirming dismissal of Eighth Amendment claim where female prison employee asked the plaintiff "to have sex with her and to masturbate in front of her and other female staffers"), *abrogated on other grounds by Porter v. Nussle*, 534 U.S. 516, 532 (2002), *as recognized in Berry v. Kerik*, 366 F.3d 85, 87–88 (2d Cir. 2003).

Accordingly, the Court dismisses Plaintiff's sexual harassment claims against Bloise under the Due Process Clause of the Fourteenth Amendment.

## IV.   Plaintiff's Retaliation Claims under the First Amendment

Defendants next argue that Plaintiff fails to state any retaliation claim under the First Amendment because his allegations are conclusory and insufficient to satisfy the pleading standard for such claims. (Mot. at 22–27.) The Court agrees.

"Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights." *Thaxton v. Simmons*, 9:10-CV-1318 MAD/RFT, 2012 WL 360104, at *7 (N.D.N.Y. Jan. 5, 2012) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381–83 (2d Cir. 2004)), *report and recommendation adopted*, 9:10-CV-1318 MAD/RFT, 2012 WL 360141 (N.D.N.Y. Feb. 2, 2012).

"Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims 'with skepticism and particular care.'" *Id.* (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted), *abrogated on other grounds by Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020); *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."

(citation omitted))); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). Accordingly, a prisoner's claim of retaliation must be supported by specific and detailed factual allegations *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. Sep. 18. 2002) (citations omitted).

To state a First Amendment claim for retaliation, a pretrial detainee must demonstrate that: (1) he was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492). "To plead adequately that an adverse action was taken against him, plaintiff must allege that he was subjected to 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his . . . constitutional rights.'" *Baskerville*, 224 F. Supp. 2d at 731 (quoting *Dawes*, 239 F.3d at 493). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes*, 239 F.3d at 493. "In this regard. prisoners may be required to tolerate more than public employees or average citizens before a purported retaliatory action taken against them is considered adverse." *Jones v. Harris*, 665 F. Supp. 2d 384, 397 (S.D.N.Y. 2009). Moreover, "[t]he causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Colon*, 58 F.3d at 872–873.

Here, Plaintiff alleges that Bloise and the supervisory defendants separately retaliated against him. As for Bloise, Plaintiff alleges that he retaliated against him on the following occasions: (1) conducting a cell search on June 23, 2018; (2) conducting a pat frisk on July 17, 2018; (3) not requiring him to provide his ID before receiving a razor so that he would be disciplined on July 27, 2018; and (4) locking him down in his cell without justification on September 7, 2019. Defendants concede that Plaintiff did engage in constitutional protected

activity by filing grievances against Bloise. (Mot. at 24.) But they contend, and the Court agrees, that none of the actions above constitute adverse actions as a matter of law.

First, courts in this Circuit have repeatedly held that "a prisoner has no reasonable expectation of privacy in his or her prison cell a search of an inmate's cell, even for retaliatory reasons, . . . does not implicate a constitutional right." *Kotler v. Boley*, 17-CV-239 (KMK), 2018 WL 4682026, at *4 (S.D.N.Y. Sept. 28, 2018) (collecting cases). The same holds true for pat frisks. *See Joseph v. Annucci*, 18-CV-7197 (NSR), 2020 WL 409744, at *5 (S.D.N.Y. Jan. 23, 2020) ("[C]ell searches and pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim" because they "are an ordinary part of prison life and. . . . do not deter the average inmate from continuing to exercise . . . [his] First Amendment rights."(citations omitted)).

As to the alleged razor incident and "lockdown," "[c]ase law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation." *Lunney v. Brureton*, 04 CIV. 2438LAKGWG, 2007 WL 1544629, at *21 (S.D.N.Y. May 29, 2007) (collecting cases), *objections overruled*, 04 CIV. 2438(LAK), 2007 WL 2050301 (S.D.N.Y. July 18, 2007); *see also Suarez v. Kremer*, 03-CV-809, 2008 WL 4239214, at *12 (W.D.N.Y. Sept. 11, 2008) (holding that "isolated inappropriate touching[,] . . . verbal harassment," "denial of recreation on one occasion," "denial of access to the law library on one occasion and being called a 'snitch'" by multiple correctional officers was "not sufficient . . . as a matter of law.") (collecting cases)). Further, even when assuming that the "lockdown" sufficiently constituted a retaliatory adverse action, Plaintiff still fails to sufficiently allege a causal connection between his filing of grievances and such adverse action, especially because this alleged "lockdown" occurred well over a year after Plaintiff had filed his first two grievances against Bloise.

And insofar as Plaintiff alleges that Bloise's "sexy chocolate" and "piece of shit" comments constitute retaliatory adverse actions, such claims are also insufficient because it is well settled that "[n]on-specific verbal threats, harassing comments, and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail*, 10 CIV. 3937 DLC, 2012 WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012) (collecting cases).

As for the supervisory defendants, Plaintiff alleges that they retaliated against him by denying him mental health services. But for one thing, Plaintiff's relevant allegations are contradictory, or at best, unclear. For example, although Plaintiff alleges that Ms. Pam informed him that OCCF wanted him to stop submitting Services Request Forms for counseling (SAC ¶ 94), Plaintiff himself later alleges that he did in fact met with Ms. Pam afterwards. (*See id.* ¶ 111.) Additionally, Plaintiff's allegations are unclear as to which of his numerous Services Requests Forms were in fact rejected, particularly because the only Services Request Form for which Plaintiff explicitly alleges that he never received a response was his thirteenth—the one he submitted on July 30, 2018. (*Id.* ¶ 113.)[2]

However, even when assuming that this denial of his thirteenth Services Request Form was an adverse action from the supervisory defendants, Plaintiff alleges in a conclusory manner that this adverse action resulted as retaliation for his grievances against Bloise. (SAC ¶ 179.) Specifically, Plaintiff neither alleges any facts to support that these supervisory defendants acted in retaliation against him, nor does he allege any causal connection between his grievances against Bloise and the retaliatory adverse action. Indeed, "[a]s general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09 CIV.

---

[2] Even though Plaintiff also explicitly alleges that he never received any response for his twelfth Services Request Form to meet with Ms. Pam, the one submitted on July 27, 2018 (SAC ¶ 113), Plaintiff also contradictorily alleges that he later met with Ms. Pam on July 28, 2018 (*id.* ¶ 111).

3135 RWS, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *see also Jones v. Fischer*, 9:10-CV-1331 GLS/ATB, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (dismissing plaintiff's retaliation claim because it was only "supported only by conclusory allegations that the retaliation was based upon complaints against another officer.").

Accordingly, the Court dismisses Plaintiff's retaliation claims against all individual defendants under the First Amendment.

## V.     Plaintiff's Deliberate Indifference Claims for Denial of Mental Health Services

Defendants next argue that Plaintiff fails to plausibly allege any deliberate indifference claims for the alleged denial of mental health services because his allegations fail to satisfy the objective and subjective standards of such claims. (Mot. at 27–31.) The Court agrees.

As mentioned briefly above, because Plaintiff was a pretrial detainee rather than a convicted prisoner at the time he was allegedly denied adequate medical care, his relevant claims fall under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). A pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

"'A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement'—such as the denial of mental health care—'by showing that the officers acted with deliberate indifference to the challenged conditions.'" *Lara-Grimaldi v. Cnty. of Putnam*, 529 F. Supp. 3d 88, 105 (S.D.N.Y. 2021) (quoting *Kelsey v. City of New York*, 306 F. App'x 700, 702 (2d Cir. 2009) (summary order)), *cert. denied*, 17-CV-622 (KMK), 2022 WL 736427 (S.D.N.Y.

Mar. 11, 2022). To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pretrial detainee must establish two elements: (1) that the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.'" *Id.* (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (citation and quotation marks omitted). To satisfy the second requirement, "the pretrial detainee must prove that the defendant-official acted intentionally" in depriving adequate medical care "or recklessly failed to act with reasonable care . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Lara-Grimaldi*, 529 F. Supp. 3d at 105 (quoting *Darnell*, 849 F.3d at 35).

Here, as discussed above, even when drawing all inferences in his favor, Plaintiff only explicitly alleges that the supervisory defendants denied him a request for mental health services on July 30, 2018. (SAC ¶ 113.)[3] But nowhere in the SAC does Plaintiff allege any facts that such purported denial was "sufficiently serious" to establish a deliberate indifference claim. For example, Plaintiff does not allege whether as a result of the supervisory defendants' alleged denial of mental health services, he began experiencing any thoughts of self-harm or suffering from anxiety or panic attacks that resulted in serious injuries or harm. *See, e.g.*, *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 237 (2d Cir. 2007) (summary order) (Plaintiff's "treatment, which

---

[3] To be clear, nowhere in his SAC does Plaintiff allege that the meetings with his counselor, Ms. Pam, were somehow grossly inadequate to meet his mental health needs such that they rose to the level of deliberate indifference. All that Plaintiff alleges is that the supervisory defendants denied him mental health services by deeming his Services Request Forms non-important and asking him through Ms. Pam and Ms. Nicole to stop submitting such requests.

allegedly included missed medication dosages and inadequate monitoring of medications, also could not be found to rise to the level of a constitutional violation because the risk of harm that [he] faced as a result of the alleged treatment was not substantial. Although a psychiatrist was not immediately informed of [his] missed dosages, [he] was an alert patient who frequently demanded and received attention from mental health workers. Furthermore, the only medical consequence he alleges was an anxiety attack, which, according to both [his] testimony and his medical records, resulted in no physical injuries and 'no acute distress.'"); *Hamm v. Hatcher*, 05 CIV. 503 ER, 2013 WL 71770, at *9 (S.D.N.Y. Jan. 7, 2013) (ten-day interruption in medication resulting in withdrawal symptoms, including "exacerbated depression, nightmares, hopelessness, and suicidal thoughts" was insufficient to establish significant risk of serious harm); *Covington v. Westchester Cnty. Dep't of Corrections*, 06 CIV. 5369 (WHP), 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) (given mental health care provided to plaintiff, medical staff was not deliberately indifferent in refusing his repeated requests for different or increased medication and additional counseling sessions); *Zimmerman v. Burge*, 9:06-CV-0176(GLSGHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (where plaintiff was seen by mental health providers once per month and prescribed an anti-depressant, prison officials were not deliberately indifferent by declining to assign him to the intermediate care program, which provided more intensive mental health treatment).

And as Plaintiff's bare and conclusory allegations fail to satisfy the objective element, the Court need not address whether these same deficient allegations satisfy the subjective element. Accordingly, the Court dismisses Plaintiff's deliberate claims for denial of mental health services against the supervisory defendants.

**VI.    Plaintiff's Supervisory Liability Claims Against the Supervisory Defendants**

Defendants next argue that Plaintiff fails to state supervisory liability claims against the supervisory defendants for failure to allege personal involvement. (*Id.* at 31–33.) The Court agrees.

"A defendant in a § 1983 action may not be held responsible unless he was personally involved in the alleged constitutional violations." *Whitton v. Williams*, 90 F. Supp. 2d 420, 427 (S.D.N.Y. 2000). "The Second Circuit has held that 'personal involvement' for these purposes means 'direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates.'" *Id.* (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir. 1996)). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Lindsey v. Butler*, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014), *on reconsideration in part*, 11 CIV. 9102 ER, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014).

Here, a review of the numerous allegations Plaintiff seemingly makes against the supervisory defendants for supervisory liability reveals that they are nothing "more than labels and conclusions" constituting "a formulaic recitation of a cause of action" that is insufficient to plead their personal involvement. *Twombly*, 550 U.S. at 555. In effect, Plaintiff's relevant allegations repeatedly assert in a conclusory and ambiguous manner that the supervisory defendants failed to either (a) undertake a meaningful investigation; (b) consider certain purportedly relevant or required circumstances; (c) address and remedy Bloise's alleged misconduct despite having notice through Plaintiff's grievances; or (d) somehow failed to intervene. (*See* SAC ¶¶ 58–60, 63–65, 88, 99, 100, 110, 119, 123, 129, 139, 145, 185.)

To begin, it is well established that a correctional official may not be held liable simply because he or she holds a position of authority. *Black*, 76 F.3d at 74. Further, "[c]ourts in this

25

circuit have said that the receipt of letters or grievances, by itself, does not amount to personal involvement." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (collecting cases). And even if personal involvement is sufficiently alleged, "[t]he law is clear that allegations that an official ignored a prisoner's letter [without more] are insufficient to establish liability." *Watson v. McGinnis*, 964 F. Supp. 127, 130 (S.D.N.Y. 1997) (collecting cases). Additionally, that correctional official merely affirms "the administrative denial of a prison inmate's grievance . . . is [also] insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca*, 01CV5178 (KMK), 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (collecting cases).

These same principles apply towards Plaintiff's claims against the unidentified correctional officers. *See Swanhart v. New York*, 20 CIV. 6819 (NSR), 2022 WL 875846, at *6 (S.D.N.Y. Mar. 24, 2022) (dismissing supervisory liability claim against John Doe defendants because plaintiff failed to sufficiently allege personal involvement); *see also Gray-Davis v. New York*, No. 5:14-CV-1490 GTS/TWD, 2015 WL 2120518, at *8 (N.D.N.Y. May 5, 2015) (same).

Accordingly, the Court dismisses Plaintiff's clams for supervisory liability against the supervisory defendants.

## VII.    Plaintiff's *Monell* Claims Against the County

Lastly, Defendants argue that Plaintiff's *Monell* claims against the County fail because he fails to sufficiently allege that the County failed to train or supervise its OCCF officers. (Mot. at 33–38). The Court agrees.

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Social Svcs. of City of New York*, 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation;

(4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009).

The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of *respondeat superior*." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity itself commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

In determining municipal liability under *Monell*, courts in the Second Circuit apply a two-step test. First, a plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (citation omitted), *cert. denied*, 480 U.S. 916 (1987). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity

27

is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

> A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

After establishing the existence of a municipal policy or custom, a plaintiff must then establish a causal link between it and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting *Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity.").

Here, Plaintiff's allegations seem to be premised on the fourth type of *Monell* theory: a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. Specifically, Plaintiff alleges that the County failed to train or provide adequate policies for OCCF staff to conduct meaningful investigations on detainee grievances and to transmit information about such grievances amongst themselves and to the attention of OCCF management. (*See* SAC ¶ 190.)

The Supreme Court has stressed that "[a] municipality's culpability for a deprivation of rights [under § 1983] is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "To state a claim for municipal liability based on failure to train, Plaintiff therefore must allege facts that support an inference that the municipality failed to train its police officers, that it did so with deliberate indifference, and that the failure to train caused his constitutional injuries." *Tieman v. City of Newburgh*, 13-CV-4178 KMK, 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015) (collecting cases).

The phrase "deliberate indifference" means more than "simple or even heightened negligence"; it involves a "conscious disregard" on the part of municipal employers for the consequences of their actions. *Brown*, 520 U.S. at 407. Deliberate indifference is a stringent standard. *Connick*, 563 U.S. at 62. "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *Canton*, 489 U.S. at 396 (O'Connor, J., concurring); *see also Corbett v. City of New York*, 1:15-CV-09214-GHW, 2016 WL 7429447, at *6 (S.D.N.Y. Dec. 22, 2016) (to infer a deficiency in training "based upon a single allegedly unconstitutional act would

be to entertain a claim that falls uncomfortably close to municipal vicarious liability, which is not cognizable under § 1983").

But particularly relevant here, it is well established that "inmate grievance programs created by state law are not required by the Constitution, and consequently allegations that prison officials violated those procedures [do] not give rise to a cognizable [Section] 1983 claim." *Alvarado v. Westchester Cnty.*, 22 F. Supp. 3d 208, 214 (S.D.N.Y. 2014) (quoting *Shell v. Brzezniak*, 365 F. Supp. 2d 362, 369–70 (W.D.N.Y.2005)); *see also Banks v. Annucci*, 48 F. Supp. 3d 394, 412 (N.D.N.Y. 2014) ("There is no constitutional right of access to the established inmate grievance program."). Moreover, it is equally well established that there is no "constitutionally protected right to a proper investigation." *Ruggiero v. Cnty. of Orange*, 19 CV 3632 (VB), 2020 WL 5096032, at *11 (S.D.N.Y. Aug. 28, 2020) (quoting *Gilliam v. Black*, No. 9:09-CV-1198 (DNH) (ATB), 2011 WL 856426, at *9 (N.D.N.Y. Feb. 4, 2011)).

On that basis, Plaintiff's allegations that the County failed to train its correctional officers with respect to how they should investigate detainee grievances fail as a matter of law because "inmate grievance programs created by state law are not required by the Constitution," *Alvarado*, 22 F. Supp. 3d at 214, and because there is no "constitutionally protected right to a proper investigation," *Ruggiero*, 2020 WL 5096032, at *11. Simply put, Plaintiff cannot state a viable claim under § 1983 even when taking his allegations as true for lack of a constitutional violation.

In any event, because the Court concluded above that Plaintiff failed to sufficiently plead an underlying constitutional violation, even when drawing all inferences in his favor, his *Monell* claims against the County must necessarily fail. *See Thomas v. Westchester Cnty.*, 12-CV-6718 CS, 2013 WL 3357171, at *6 (S.D.N.Y. July 3, 2013) ("Absent an underlying constitutional violation, a *Monell* claim cannot lie." (citing *Bolden v. Cnty. of Sullivan*, No. 11–CV–4337, 2013

WL 1859231, at *2 (2d Cir. May 6, 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct."); *Segal v. City of N. Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action . . . it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original)).

Accordingly, the Court dismisses all of Plaintiff's *Monell* claims against the County.

## VIII.   **Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted). "Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, Plaintiff has already amended twice after having the benefit of two pre-motion letters from Defendants stating the grounds on which they would move to dismiss (ECF Nos. 17 & 44), as well as the Court's previous opinion highlighting the deficiencies in his claims (ECF No. 42). Generally, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of

theories *seriatim.*") (alteration, footnote, and internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, Plaintiff has not otherwise suggested that he is in possession of facts that would cure the deficiencies that Defendants highlighted in the instant motion and that the Court highlighted in this opinion. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make the complaint viable and plaintiffs did not request leave to amend). Accordingly, the Court dismisses the SAC with prejudice.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss (ECF No. 48) and DISMISSES Plaintiff's Second Amended Complaint with prejudice. The Clerk of Court is directed to terminate the motion on ECF No. 48 and this action, to enter judgment accordingly, and to close the case.

Dated:  September 30, 2022
       White Plains, NY

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge